AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (202) 330-3923

)
)
)
)
)
)

Case No. 1:20-sw-324

UNDER SEAL

MAR 1 1 2020

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachment A.

located in the ____Northern____ District of _____Texas_____ , there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Selling Firearms without a License. |

The application is based on these facts:
See attached affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

AUSA John C. Blanchard/AUSA Morris Parker

*Applicant's signature*

Gordon Cummings, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ____March 11, 2020____

/s/
Theresa Carroll Buchanan
United States Magistrate Judge
*Judge's signature*

City and state: ____Alexandria, Virginia____

Hon. Theresa Carroll Buchanan, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MAR 1 1 2020

IN RE: APPLICATION OF THE UNITED
STATES OF AMERICA FOR SEARCH
WARRANT AND ORDERS PURSUANT TO
18 U.S.C. §§ 2703(C)(1)(A) AND 3122(A)(1)
FOR THE

No. 1:20-ec-485
1:20-sw-324

(1) DISCLOSURE OF PROSPECTIVE
CELL-SITE DATA AND E-911 PHASE II
DATA;

(2) DISCLOSURE OF STORED
TELECOMMUNICATIONS RECORDS;
AND

(3) INSTALLATION OF A PEN
REGISTER/TRAP AND TRACE
DEVICE

ON **(202) 330-3923**

## **AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE**

I, Gordon Cummings, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an Application for a Search Warrant under 18

U.S.C. §§ 2703(c)(1)(A) for information associated with a cellular device assigned with the

telephone number **(202) 330-3923** ("SUBJECT TELEPHONE NUMBER"), which is serviced by

AT&T MOBILITY ("TELEPHONE SERVICE PROVIDER"), headquartered at 208 South

Akard Street, Dallas, TX 75201. As a provider of wireless communications service, the

TELEPHONE SERVICE PROVIDER is a provider of an electronic communications service, as

defined in 18 U.S.C. § 2510(15).

2. Because this warrant seeks the prospective collection of information, including

cell site location information, that may fall within the statutory definitions of information

collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3123(3) & (4)

("pen/trap device"), the requested warrant is designed also to comply with the Pen Register Act,

*see* 18 U.S.C. §§ 3121–3127.  The requested warrant therefore includes all the information

required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.     The information to be searched is described in the following paragraphs and in

Attachment A.  This Affidavit is made in support of an Application for a Search Warrant under

18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the

TELEPHONE SERVICE PROVIDER to disclose to the government the information further

described in Section I of Attachment B.  Upon receipt of the information described in Section I

of Attachment B, government-authorized persons will review the information to locate items

described in Section II of Attachment B.

4.     I am a Special Agent with the United States Department of Homeland Security –

Homeland Security Investigations ("HSI"), the investigative component of Immigration and

Customs Enforcement ("ICE").  I am an investigator or law enforcement officer of the United

States within the meaning of 18 U.S.C. §2510(7), that is, an officer of the United States who is

empowered to conduct investigations and to make arrests.

5.     I have been a Special Agent with HSI since 2010.  Prior to joining HSI, I was a

Special Agent with the General Services Administration Office of the Inspector General from 2000

through 2010.  Since 2000, I have received training and gained experience in fundamental areas

of law enforcement, including but not limited to interview techniques, the preparation and

execution of search warrants, search and seizure procedures, and arrest procedures.  Throughout

my career as a federal law enforcement officer, I have received training in and investigated cases

involving firearms violations, narcotics, money laundering, white collar crime, and other criminal

2

activities. In the course of conducting criminal investigations, I have interviewed confidential informants and cooperating witnesses, conducted both physical and electronic surveillance, supported undercover operations, analyzed financial records, and analyzed phone and internet records. I have participated in and executed numerous search and arrest warrants.

6.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and information obtained from other state and federal law enforcement officers. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation. This Affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.      Based on the facts set forth in this Affidavit, there is probable cause to believe that criminal violations of 18 U.S.C. §§ 922(a)(1)(A) (dealing in firearms without a license) and 922(o) (transferring a machine gun) have been committed, and are being committed, by Davud SUNGUR ("SUNGUR"). There is also probable cause to search the information described in Attachment A for records and information associated with the cellular telephone assigned to SUBJECT TELEPHONE NUMBER, that are stored at premises controlled by the TELEPHONE SERVICE PROVIDER, of these crimes as further described in Attachment B.

8.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, 18 U.S.C. § 2711(3)(A)(i).

3

## PROBABLE CAUSE

9.      HSI, the Fairfax County Police Department ("FCPD"), and the Bureau of Alcohol,

Tobacco, Firearms & Explosives ("ATF") are investigating SUNGUR, a 19 year-old male

residing in the Eastern District of Virginia, regarding possible violations of 18 U.S.C. §§

922(a)(1)(A) (dealing in firearms without a license) and 922(o) (possession or transfer of a

machinegun), among other crimes.

### A. First Firearms Purchase

10.      On or about January 2, 2020, a detective with the FCPD's Organized Crime &

Intelligence Bureau who frequently operates in an undercover capacity ("UD 1") received

information from a confidential source ("CS") that SUNGUR was selling firearms. That same

day, the CS provided SUNGUR with UD 1's telephone number, SUBJECT TELEPHONE

NUMBER, telling SUNGUR that the detective was a potential firearms buyer. Later that

evening, SUNGUR texted UD 1 from SUBJECT TELEPHONE NUMBER[2], introducing himself

and stating that he had been informed that UD 1 was looking for "some stuff." After UD 1

replied, "Yeah," the following conversation took place:

SUNGUR:      He told me that he showed you what I have. Do you need any more

information on it? They are 100% clean never used with no writings on it. Brand new made.

UD 1:      Call me no BS

---

[2] Records provided by AT&T Mobility in compliance with a search warrant (case no. 1:20-sw-132, under seal) authorized by the Honorable John F. Anderson, United States Magistrate Judge for the Eastern District of Virginia, on February 13, 2020, revealed that SUNGUR's father is the subscriber of this number and that the billing address for the account is the University Drive address referenced in paragraphs 11, 16, and 17.

11.     Shortly thereafter, SUNGUR called UD 1 using that same number. SUNGUR told UD 1 that he had made two pistols the previous week, and that he could sell both firearms for a total of $1,600. SUNGUR told UD 1 that the pistols would come with 100 rounds of ammunition, two extended magazines, and two 15-round magazines.

12.     On or about January 3, 2020, SUNGUR met UD 1 at a prearranged location in Fairfax County, Virginia, within the Eastern District of Virginia, to conduct the transaction. At approximately 11:00 A.M., SUNGUR arrived at the location in a gray Honda Civic[3] sporting a bike rack on the rear of the vehicle.

13.     SUNGUR approached UD 1's vehicle and made contact with UD 1 and a second undercover detective ("UD 2"). The detectives recorded audio of the encounter. SUNGUR and the two detectives stood outside of UD 1's vehicle. SUNGUR wished to show UD 1 and UD 2 the quality of the pistols he had made, and proceeded to don blue latex gloves. SUNGUR then disassembled two Glock-style, polymer-frame 9mm pistols to show the detectives that they were in good condition. SUNGUR pointed out that there were no serial numbers on either pistol and explained that such pistols are legal to own but not to sell. SUNGUR told UD 1 and UD 2 that he is trying to get "bigger" in the business and planned to obtain a federal firearms license when he turned 21.

14.     UD 2 asked SUNGUR if he did anything else, to which SUNGUR replied, "I mean, I'm trying to get into building AR's and AK's, but I haven't gotten there yet. I'm just doing Glocks right now. I mean, I can get you guys AR's and AK's, but they would have

---

[3] This vehicle has been observed at a residence in Vienna on multiple occasions by law enforcement. However, a different subject has been observed getting into the vehicle at that residence and driving it away.

numbers on them." SUNGUR also mentioned that he had a 3D printer and could provide a component capable of rendering a firearm fully automatic.

15.     Prior to leaving the location, SUNGUR sold the two 9mm pistols, two 30-round 9mm magazines, two 15-round 9mm magazines, 100 rounds of "Tulammo" 9mm ammunition, and 100 rounds of "Wolf" 9mm ammunition to the detectives in exchange for $1,600 in FCPD buy funds.

16.     After completing the transaction, I used a law enforcement database to query the number of the license plate of the Honda Civic in which SUNGUR had arrived. That query showed that the Civic is registered to an individual who was later identified as SUNGUR's father at an address on University Drive in Fairfax, Virginia. A Virginia Department of Motor Vehicles database query also revealed that the same University Drive address is listed as SUNGUR's current address.

### B.     Second Firearm Purchase

17.     On or about the morning of January 7, 2020, SUNGUR texted UD 1, and the following conversation took place:

SUNGUR:     "How u doing? Would you be interested in the AR?"

UD 1:          "Yes. U have to give me a good price."

SUNGUR:     "2000 comes with 5 mags and ammo. It's an upgraded firearm in almost brand new conditions i put about 50 rounds through it. 100% clean."

UD 1:          "Call me"

18.     SUNGUR proceeded to call UD 1 and advised that he was in possession of an AR-15 with an upgraded trigger that a friend had installed. SUNGUR added that the AR-15 would come with multiple magazines and ammunition, some of which would consist of armor-

piercing rounds.  SUNGUR stated that for no extra charge, he could give UD 1 a piece for the

AR-15 that would render the rifle fully automatic.  SUNGUR explained to UD 1 that he was

waiting for the part to arrive but would show UD 1 how to install it.  UD 1 expressed his interest

in all of the foregoing to SUNGUR and discussed meeting soon to conduct the transaction.

19.     SUNGUR and UD 1 continued to communicate via text message and ultimately

agreed to meet at the same prearranged location on January 22, 2020 to conduct the transaction.

20.     On January 22, 2020, FCPD detectives conducted surveillance at SUNGUR's

suspected address on University Drive and observed SUNGUR exit that residence carrying a

black box.  The detectives observed SUNGUR enter a silver Toyota Rav-4 and drive away.  A

law enforcement database query of the vehicle's license plate number revealed that the Rav-4 is

registered to SUNGUR's father at the University Drive address.

21.     SUNGUR proceeded to meet UD 1 and UD 2 at the same prearranged location in

Fairfax County.  The detectives recorded audio of the encounter.  Upon SUNGUR's arrival, UD

1 and UD 2 exited their vehicle and met with SUNGUR at the rear of the vehicle in which he had

arrived.  SUNGUR provided UD 1 with what appeared to be the same black box that SUNGAR

had been observed carrying out of the University Drive residence.  SUNGAR then accompanied

UD 1 to UD 1's vehicle.  Once inside the vehicle, UD 1 opened the box, which contained an AR-

15 rifle.

22.     SUNGUR again donned gloves and began explaining what he had done to make

the rifle fully automatic.  SUNGUR showed the detectives a small, plastic object that he called a

"bottle opener," which he claimed had been created by a friend on a 3D printer and which he said

would render the AR-15 fully automatic when placed inside the rifle.  SUNGUR proceeded to

place the object inside the rifle to show UD 1 how to make the firearm fully automatic.

23.    SUNGUR subsequently sold UD 1 and UD 2 the AR-15 rifle bearing serial number 134355, four empty magazines, .223 caliber ammunition, and the "bottle opener" in exchange for $2,000 in FCPD buy funds.

24.    The AR-15's receiver was produced by Spikes Tactical, a company headquartered in Florida.

25.    Prior to leaving the location, SUNGUR told UD 1 and UD 2 that he had ordered additional lower receivers to make more pistols, and showed them a MAC-11 firearm he had stored under the driver's seat of his vehicle. When UD 1 and UD 2 expressed interest in the MAC-11, SUNGUR advised he was working on rendering it capable of firing fully automatically.

26.    On or about the early evening of January 23, 2020, SUNGUR and UD 1 had a conversation via text message in which they discussed the potential sale and purchase of the MAC-11. In so doing, they discussed the price of the firearm:

SUNGUR:    "These are regular firearm dealer prices."

UD 1:    "Ok u paid 2.  What u gonna charge me?"

SUNGUR:    "I was thinking 6 would be a fair price, considering its 10k on the other market and on the regular market its priced at 7-8k."

UD 1:    "We can talk later make sure I get first show to get it, work on that price."

SUNGUR:    "Alright."

C.    February 1, 2020 Walmart Encounter

27.    On or about February 1, 2020, a FCPD patrol officer responded to the Walmart located in the 11000 block of Lee Highway in Fairfax, Virginia, for a call about a suspicious person with what looked like a firearm in the parking lot. Upon arrival, the officer encountered

8

SUNGUR sitting inside the back seat of the same Toyota Rav-4 he had driven to the January 22, 2020 deal with UD 1 and UD 2.

28.     SUNGUR explained to the officer that he was working on a lower receiver for a firearm, and showed the officer the piece on which he was currently working. The officer noted that the receiver lacked various components critical to a firearm's operation. SUNGUR explained that he was planning on building a firearm to completion, and showed the officer how he was drilling a hole in the stripped-down receiver. When asked why he was working on his firearm in the Walmart parking lot, SUNGUR advised that he was waiting for a friend who was supposed to be meeting him there. SUNGUR then complained to the officer, questioning why someone would call the police on him when he was simply exercising his constitutional rights.

29.     When the officer later called the reporting party to discuss his encounter with SUNGUR, the reporting party informed him that he had found a note on his car after exiting the Walmart that read: "Nice. Calling the cops on someone simply building a Glock lower in his vehicle. I'm protecting my 2A rights. Please don't try to infringe people's rights. Only tyrants infringe rights. SIC SEMPER TYRANNIS. Free men don't ask permission. If you are interested in buying a gun (legally) call me at [the same AT&T Mobility number used to communicate with the detectives]."

**D.     Third Firearm Purchase**

30.     On or about February 10, 2020, SUNGUR texted UD 2 a photograph of what appeared to be a Glock-style, polymer-frame pistol with an extended magazine.

31.     On or about February 11, 2020, SUNGUR called UD 2. UD 2 told SUNGUR that he wished to purchase the pistol and extended magazine pictured in the February 10, 2020 text, and asked SUNGUR if he had anything else for sale. SUNGUR responded that he did not have

anything else for sale but could sell UD 2 the pistol with an extended magazine, a regular magazine, and ammunition for $800. SUNGUR explained to UD 2 that he usually sells Glocks for $900 and that he has sent such firearms to customers in California as well as to local customers who were otherwise unable to obtain firearms. SUNGUR told UD 2 he was going to keep his MAC-11 because it was "too hot," and told UD 2 that he also had a "Draco." Based on my training and experience, I know that a "Draco" is an AK-47-style pistol.

32.     When UD 2 asked SUNGUR if he had any more "bottle openers," SUNGUR responded that he would sell UD 2 the last one he had for $50. SUNGUR explained to UD 2 that the true name of the component was actually a "drop-in auto sear," but that he called it a "bottle opener." SUNGUR and UD 2 agreed to meet at the same location in Fairfax County where they had met on January 3 and 22.

33.     On or about February 19, 2020, SUNGUR met UD 2 at the same prearranged location in Fairfax County. SUNGUR arrived in the aforementioned Rav-4, exited that vehicle, and entered UD 2's vehicle. The detectives recorded audio of the encounter. SUNGUR then handed UD 2 a brown cardboard box containing a Glock-style, polymer-frame 9mm handgun devoid of any serial number, along with ammunition and a drop-in auto sear. SUNGUR told UD 2 that he had forgotten the extended magazine. Thereafter, he returned to his vehicle momentarily before re-entering UD 2's vehicle with a standard 9mm magazine that he said UD 2 could have free of charge.

34.     During their ensuing conversation, SUNGUR admitted that he made the pistol. SUNGUR explained to UD 2 how he orders firearm lower receivers and then outfits them with other firearm parts to create fully functioning handguns. SUNGUR stated that he had obtained a kit that aids him in making the handguns, and noted that a benefit of making one's own handgun

is that it will not contain a serial number. SUNGUR acknowledged that it is illegal to sell a gun without a serial number. When UD 2 asked what he should tell the police should he be caught with a handgun devoid of a serial number, SUNGUR instructed UD 2 to tell the police that UD 2 had made it himself.

35.     During the meeting, SUNGUR told UD 2 that he had made the drop-in auto sear on a 3D printer that he had purchased for $300, adding that he was in possession of the "files" needed to make such a product. SUNGUR told UD 2 that one cannot purchase a drop-in auto sear online and, when asked if a drop-in auto sear was illegal to possess, responded "yeah, pretty much." SUNGUR told UD 2 that if a police officer looked at the drop-in auto sear, the officer would not know what it was, but that if an ATF agent looked at it, the agent would know what it was.

36.     SUNGUR explained to UD 2 how the drop-in auto sear makes a gun fully automatic. SUNGUR showed UD 2 how to fit the drop-in auto sear into the pistol, and told him that he would need to sand the auto sear in order to ensure it would fit properly.

37.     SUNGUR told UD 2 that he usually sells firearms as soon as he obtains them, and that the only guns he presently owned were the MAC-11 and the Draco. With regard to the Draco, which he claimed was a Serbian import, SUNGUR said he was thinking about converting it into a fully automatic firearm. SUNGUR told UD 2 he had previously sold guns to customers in California via the mail, stating that he could get a higher profit for doing so. He also stated that he had mailed 15 rounds of ammunition hidden in a sunglasses case to a friend in Canada.

38.     SUNGUR told UD 2 that he would be getting four Glock handguns in the next few weeks, and asked UD 2 if they could work together to send the guns to Turkey, stating that he has a good connection in Turkey he can trust.

11

39.     SUNGUR also told UD 2 that he has a "file" on his 3D computer to create a silencer, but that he had not produced one yet.

40.     At the conclusion of the conversation, SUNGUR sold UD 2 a 9mm pistol, a 9mm magazine, a box of 9mm ammunition, and a drop-in auto sear in exchange for $800 in FCPD buy funds.

41.     The above-referenced pistols are "firearms" as defined in 18 U.S.C. § 921(a)(3). SUNGUR is not a federal firearms licensee.

42.     In all aforementioned contacts between UD 1 and SUNGUR, SUNGUR used the SUBJECT TELEPHONE NUMBER to communicate with UD 1 regarding their firearms transactions.

**E.      November 2019 Firearm Recovery**

43.     The Homicide Division of the FCPD's Criminal Investigations Bureau has recently informed members of the law enforcement team investigating SUNGUR that an AK-47 rifle was recovered during the November 28, 2019 execution of a search warrant. After tracing that rifle's serial number, detectives spoke to the rifle's original purchaser, who advised that he had recently sold the rifle to a thin young man who drove a Toyota Rav-4. The original purchaser provided detectives with that young man's phone number, which matches the AT&T Mobility number that SUNGUR has used to communicate with UD 1 and UD 2 and that was written on the note left on the February 1, 2020 Walmart reporting party's windshield.

44.     In my training and experience, I have learned that the TELEPHONE SERVICE PROVIDER is a company that provides cellular communications service to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information (1) about the locations of the cellular telephones to which

they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and (2) cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

45.     Based on my training and experience, I know that TELEPHONE SERVICE PROVIDER can collect E-911 Phase II data about the location of the SUBJECT TELEPHONE NUMBER, including by initiating a signal to determine the location of the SUBJECT TELEPHONE NUMBER on TELEPHONE SERVICE PROVIDER's network or with such other reference points as may be reasonably available.

46.     Based on my training and experience, I know that TELEPHONE SERVICE PROVIDER can collect cell-site data about the SUBJECT TELEPHONE NUMBER. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless

providers such as TELEPHONE SERVICE PROVIDER typically collect and retain cell-site data

pertaining to cellular devices to which they provide service in their normal course of business in

order to use this information for various business-related purposes

      47.     Based on my training and experience, I know that each cellular device has one or

more unique identifiers embedded inside it. Depending on the cellular network and the device,

the embedded unique identifiers for a cellular device could take several different forms,

including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number

("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a

Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International

Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").

The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can

be recorded by pen/trap devices and indicate the identity of the cellular device making the

communication without revealing the communication's content.

      48.     Based on my training and experience, I know that wireless providers such as the

TELEPHONE SERVICE PROVIDER typically collect and retain information about their

subscribers in their normal course of business. This information can include basic personal

information about the subscriber, such as name and address, and the method(s) of payment (such

as credit card account number) provided by the subscriber to pay for wireless communication

service. I also know that wireless providers such as the TELEPHONE SERVICE PROVIDER

typically collect and retain information about their subscribers' use of the wireless service, such

as records about calls or other communications sent or received by a particular device and other

transactional records, in their normal course of business. In my training and experience, this

information may constitute evidence of the crimes under investigation because the information

can be used to identify the SUBJECT TELEPHONE NUMBER's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

48.     Based on the foregoing, I request that the Court issue the proposed Search Warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

49.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the SUBJECT TELEPHONE NUMBER would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

50.     I further request that the Court direct the TELEPHONE SERVICE PROVIDER to disclose to the government any information described in Attachment B that is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER. I also request that the Court direct the TELEPHONE SERVICE PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the

15

information described in Attachment B unobtrusively and with a minimum of interference with services of the TELEPHONE SERVICE PROVIDER, including by initiating a signal to determine the location of the SUBJECT TELEPHONE NUMBER on the network of the TELEPHONE SERVICE PROVIDER or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the TELEPHONE SERVICE PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

51. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONE NUMBER outside of daytime hours.

Respectfully submitted,

Special Agent Gordon Cummings
Homeland Security Investigations

Sworn and subscribed to before me on

___March 11, 2020___                    /s/
                    Theresa Carroll Buchanan
                    United States Magistrate Judge

Hon. Theresa Carroll Buchanan
United States Magistrate Judge

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

1.  The cellular telephone assigned call number **(202) 330-3923** ("SUBJECT TELEPHONE NUMBER"), whose wireless service provider is AT&T MOBILITY ("TELEPHONE SERVICE PROVIDER PROVIDER"), headquartered at 208 South Akard Street, Dallas, TX 75201.

2.  Records and information associated with the SUBJECT TELEPHONE NUMBER that is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**INFORMATION TO BE DISCLOSED BY THE PROVIDER**

To the extent that the information described in Attachment A is within the possession, custody, or control of the TELEPHONE SERVICE PROVIDER, including any information that has been deleted but is still available to the TELEPHONE SERVICE PROVIDER or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the TELEPHONE SERVICE PROVIDER is required to disclose to the government the following information pertaining to the SUBJECT TELEPHONE NUMBER listed in Attachment A and its related account with the TELEPHONE SERVICE PROVIDER ("SUBJECT ACCOUNT"):

**The following information about the customers or subscribers associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:**

1. Names (including subscriber names, user names, and screen names);

2. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

3. Local and long distance telephone connection records;

4. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

5. Length of service (including start date) and types of service utilized;

6. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

7. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

8. Means and source of payment for such service (including any credit card or bank account number) and billing records.

**B. The following historical stored telecommunications records associated with the SUBJECT ACCOUNT for the time period of 60 days preceding the date the Warrant is executed up to the present:**

1. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the SUBJECT ACCOUNT, including:

   a. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the SUBJECT TELEPHONE NUMBER.

**C. The following prospective data associated with the SUBJECT TELEPHONE NUMBER for the time period of 30 days from the date the Warrant is executed (or the date the monitoring of the SUBJECT TELEPHONE NUMBER's location becomes operational, whichever is later:**

1. Information associated with each communication to and from the SUBJECT TELEPHONE NUMBER for a period of 30 days from the date of this warrant, during all times of day and night, including:

   a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   b. Source and destination telephone numbers;

   c. Date, time, and duration of communication; and

   d. All available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the SUBJECT TELEPHONE NUMBER

2

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**INFORMATION TO BE SEIZED BY THE GOVERNMENT**

All information described above in Section I that constitutes cell-site data and transactional and stored records for the cellular device assigned the SUBJECT TELEPHONE NUMBER under the evidentiary standard articulated by Federal Rule of Criminal Procedure 41(d)(1) and pursuant to 18 U.S.C. § 2703(c)(1)(A) of violations of 18 U.S.C. §§ 922(a)(1)(A) (unlicensed dealing in firearms) and 922(o) (transferring a machine gun) involving Davud SUNGUR.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the TELEPHONE SERVICE PROVIDER in order to locate the things particularly described in this Warrant.